[Cite as *Reed v. Multi-Cty. Juvenile Sys.*, 2010-Ohio-6602.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| KELLY REED, | ) | |
| | ) | CASE NO.  09 CO 27 |
| PLAINTIFF-APPELLEE/ | ) | |
| CROSS-APPELLANT, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| MULTI-COUNTY JUVENILE SYSTEMS, | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS/ | ) | |
| CROSS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:          Civil Appeal from Common Pleas
                                                             Court, Case No. 08 CV 269.

JUDGMENT:                                        Affirmed.

APPEARANCES:
For Plaintiff-Appellee/
Cross-Appellant:                                 Attorney Richard Abrams
                                                             Attorney Richard T. Bush
                                                             Attorney Charles W. Oldfield
                                                             Green, Haines, Sgambati, Co., LPA
                                                             P.O. Box 849
                                                             16 Wick Avenue, Suite 400
                                                             Youngstown, OH  44501

For Defendants-Appellants/
Cross-Appellees:                                 Attorney Michael Zirpolo
                                                             Suite 206 Belden Village Tower
                                                             Canton, OH  44718

JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Gene Donofrio

                                                             Dated: December 30, 2010

DeGenaro, J.

{¶1} Defendants/Appellants/Cross-Appellees, Multi-County Juvenile Attention System and individual employees of MCJAS timely appeal the July 13, 2009 decision of the Columbiana County Court of Common Pleas, denying their motion for summary judgment regarding Plaintiff/Appellee/Cross-Appellant Reed's state tort claims against the employees. The employees argue that they did not fail to raise the affirmative defense of statutory immunity in their answer, and that the trial court erred in finding that they had waived the defense. Reed filed a cross-appeal from the same order, which granted MCJAS's motion for summary judgment regarding her federal claims. Reed argues that the trial court erred in finding that MCJAS and its employees were entitled to qualified immunity from Reed's Section 1983 claims. Both parties raised conditional assignments of error.

{¶2} Reed's complaint arose from allegations of sexual assault committed against Reed by Howell, who was an MCJAS employee, and is not a party to the appeal. In the combined answer for both MCJAS and its employees, the affirmative defense of statutory immunity was raised only by MCJAS, and thus was waived by the employees. Regarding Reed's 1983 claim, there was nothing presented to indicate that MCJAS or its employees had acted with deliberate indifference regarding the risk posed by Howell. For these reasons, the parties' respective arguments are meritless. Because their assignments of error are meritless, their respective conditional assignments of error are moot. Accordingly, the trial court's decision is affirmed.

## Facts and Procedural History

{¶3} On March 5, 2008, Reed filed a complaint, naming MCJAS, the Board of Trustees of MCJAS, Howell and other individual employees of MCJAS as defendants. Reed alleged that she had been confined at MCJAS's facility, the Louis Tobin Center, during the spring and fall of 2005, when she was sixteen years old, and that Howell, an employee at the Tobin Center at that time, had repeatedly sexually assaulted her.

{¶4} In addition to her claims against Howell, Reed also asserted state and federal claims against MCJAS and its employees. Specifically, Reed alleged that the MCJAS and its employees breached their duties to protect Reed in a wanton or reckless

manner. Reed also alleged that MCJAS and its employees, while acting under color of law, were deliberately indifferent to Reed's safety by disregarding the substantial risk of serious harm posed by Howell

**{¶5}** Howell answered Reed's complaint separately, as he was no longer an employee of MCJAS. MCJAS and all other defendants filed an answer, stating the following affirmative defenses:

**{¶6}** "1. MCJAS is a political subdivision engaging in a government function, to-wit: the operation of places of juvenile detention, as defined by Section 2744.01(C)(1)(h) of the Ohio Revised Code, and such [sic] has governmental immunity pursuant to Section 2744.02(A)(1) of the Ohio Revised Code.

**{¶7}** "2. Plaintiff's claims are barred by the applicable statutes of limitations.

**{¶8}** "3. Plaintiff's complaint fails to state any claims against MCJAS and the other answering Defendants, on which relief can be granted."

**{¶9}** Upon receiving leave from the trial court, Reed filed an amended complaint , and MCJAS and its employees filed an amended answer stating the following:

**{¶10}** "1. Answering Defendants, including the Defendants who are newly named in the first amended complaint, hereby restate in its entirety, the answer filed first in this cause.

**{¶11}** "2. Answering Defendants are shielded from liability relative to the various claims Plaintiff has made under 42 U.S.C.A. §1983 and the Eight [sic] Amendment to the Constitution of the United States by qualified immunity, as that term has been defined by federal law."

**{¶12}** MCJAS and its employees filed a motion for summary judgment supported by depositions of Reed and 10 employees arguing: 1) MCJAS was a political subdivision and therefore MCJAS and its employees were entitled to statutory immunity and shielded from liability from Reed's state law claims, and 2) they were entitled to qualified immunity from Reed's Section 1983 claims, due to the lack of evidence indicating that any of them had known that there was a substantial risk that Howell was sexually assaulting Reed or that they had failed to take reasonable measures to stop Howell's actions.

Deposition Testimony Filed with Summary Judgment Motion

{¶13}  Reed had been sent to Tobin for 45 days, starting in April of 2005, after she was expelled from school for hitting a teacher.  In September of 2005, Reed was returned to Tobin after she drove her mother's car without a license and was in an accident.  Around that time, Reed had an incident with her probation officer, where she became angry at him and unbuttoned her pants, apparently threatening to accuse him of misconduct if he did not allow her to speak with her mother.  Two or three weeks after Reed had returned to Tobin, Howell began to hit on her.  During the following weeks, Reed and Howell had sexual intercourse approximately 5 times, and Reed performed oral sex on Howell approximately 19 or 20 times.  All of these incidents occurred in the Tobin kitchen walk-in refrigerator, save for one incident in the kitchen storage area.  Howell also attempted sexual conduct with Reed at one point in a movie storage room, but Reed refused because she was afraid that another employee would catch them.  Reed was alone with Howell during the incidents because she was the only Youth Aide at Tobin for a time.  A resident achieves the status of Youth Aide through good behavior, and the status allowed privileges such as being able to stay up one hour later than the other residents, and helping employees with various tasks.  Reed did not tell anyone at Tobin about the incidents with Howell.  While at Tobin, Reed wrote a letter to her mother about her relationship with Howell, but believed that her mother did not think that Reed was serious. After Reed had been transferred to a residential treatment center in November, she divulged her interactions with Howell to a fellow resident, who reported the information to a treatment center employee, Rebecca Olihan.

{¶14}  David Vanderwall, Director of Detention Services for MCJAS, oversees a number of facilities, including Tobin.  His main contact was with the Tobin Administrator, Denna Bryan.  Vanderwall's role in disciplinary proceedings was to perform investigations and hearings, and to provide a report to the Superintendant, Donald Thernes, who would decide on any disciplinary actions.  Vanderwall described the disciplinary proceedings regarding Howell for breaking a cabinet, one incident of horseplay with a male resident, and one incident of unnecessarily physically restraining a noncompliant male resident. He had heard from Bryan that Howell had had difficulty adjusting after returning from Iraq,

and was developing a drinking problem. Bryan had gotten this information from general concern voiced by co-workers, but there was no evidence that it was affecting his work. There were usually three or four staff members working with the 18 or 19 kids at any one time at Tobin. The incidents between Reed and Howell occurred at a time in the evening when the other staff members were occupied with helping the residents prepare for bed. Video cameras were placed at Tobin to have proof in the event of any incidents or allegations, but they are not used for real-time monitoring, and there is no rule or procedure for regularly reviewing them. The cameras are also used so that supervisors can check that the night-shift workers performed their tasks. Tobin had a rule against male employees entering any all-female wing without being accompanied by a female employee, and vice-versa, but there was no rule forbidding employees from ever being alone with residents of the opposite sex. Vanderwall stated that the references he made to Howell regarding such a rule was about accountability, not putting himself in a compromising situation, especially with Reed given her history of false allegations.

{¶15} Vanderwall conducted a pre-disciplinary report on Howell after Olihan reported Reed's allegations. Upon review of the security cameras, the videos showed Reed and Howell going into the kitchen and out of camera view on eight instances over thirty days, for a total of 33 minutes of time off-camera. Vanderwall did not see any concrete evidence of sexual activity in the videos, but he did find that Howell's actions evidenced poor judgment at the very least. Vanderwall interviewed employees during his investigation, and none of them felt that anything improper might be going on between Howell and any female resident. They did not notice whether Howell regularly selected Reed to help in the kitchen. Various employees used Reed's help in the kitchen, and she had the choice to do so as a Youth Aide. Thus, her being in the kitchen with Howell did not by itself indicate that something inappropriate was happening. No one had noticed Howell and Reed entering the kitchen with the lights off.

{¶16} Although Vanderwall was aware of Reed's prior threat of false allegations, he found her story of the present events to be very consistent. He found Reed to be persuasive, and although he was not sure if her allegations were true, the policy of zero tolerance for questionable behavior led him to decide not to take any chances.

Vanderwall concluded in his letter that Bryan's allegation that Howell's actions were unacceptably suspicious was true.

{¶17} Denna Bryan, Administrator of the Tobin facility, allowed Howell to transfer to a position at Tobin, and noted he had good job performance evaluations at his prior MCJAS facility. It had been reported that Howell was talking with other employees about his sexual history, which was inappropriate due to the potential that residents may overhear. Bryan recommended counseling to Howell when he returned to work after Iraq, because a parent had died right beforehand, Howell was struggling, and had started drinking. Bryan was concerned with Howell's discipline issues, but none raised the suspicion of possible sexual misconduct.

{¶18} In addition to the disciplinary proceedings described by Vanderwall, Bryan noted that she started an investigation against Howell for an alcohol-related car accident on October 24, 2005. Although Howell was not at work, Tobin's policy is to investigate any inappropriate behavior outside employment that is related to alcohol or drugs. Bryan then began an investigation of Reed's allegation. From Bryan's interviews with the employees, some staff had found Reed in the kitchen with Howell on a few occasions, but did not find that suspicious, as it was common for Reed to help various employees in the kitchen. Bryan remembered one employee, Emily Mitchell, reporting that she had overheard male residents commenting on Howell and Reed being in the kitchen together. During Emily Mitchell's deposition, she stated that she did not hear male residents talking about Howell and Reed, but she did report an incident when a male resident had reported to her that Howell had claimed that all of the female staff "wanted him."

{¶19} There was no official policy against employees being alone with residents of the opposite sex, but Bryan did tell Howell he should not be alone with female residents, as a part of maintaining proper boundaries, avoiding compromising situations, and avoiding putting all parties at risk by going off-camera. In general, it was acceptable for employees to be alone in a room with residents, but it was not acceptable to repeatedly spend time out of camera view. Bryan concluded from reviewing the video recordings that Howell had gone out of camera view with Reed for an excessive amount of time. Bryan noted that the cameras were used to protect both the residents and the staff, and

that they were not monitored in real time. Bryan did not see any sexual misconduct occurring, but she found that the amount of time off-camera was too much of an opportunity for misbehavior, and there was no excuse for Howell turning the lights off in the kitchen on two occasions.

{¶20} Charles Collier, Afternoon Supervisor at Tobin during the fall of 2005, supervised Howell, and only vaguely remembered Reed. There is a no-touch policy that applies to both the staff and the residents, but there is no policy that prohibits staff members from being alone with individual residents. Collier did not remember discipline against Howell for the prior incidents described by Vanderwall. Staff members might often be alone with residents for short periods of time, which is normal and acceptable. Howell would necessarily go into the kitchen alone with various individual residents to perform certain tasks. However, had anyone noticed Howell going into the kitchen alone with a resident and turning the lights off, there would have been a problem. The purpose of the cameras is to generally know what is going on in the building, for general safety purposes, but no one is assigned to monitor the security videos full-time. Collier would not have been at the security video monitor while Howell was doing kitchen cleanup, because Collier would have been elsewhere in the building on shower duty. Collier did not recall a specific time when Howell went into the kitchen area alone with Reed, and noted that Howell would have done that numerous times with various Tobin residents.

{¶21} Lori Williams, Day Shift Supervisor at Tobin during the fall of 2005, did not remember Reed and somewhat remembered Howell, but did not often work with him. Williams stated that it would not be a problem for a staff member to be alone with a resident, and that MCJAS does not have any policy forbidding male staff members to be alone with female residents. Williams was not aware of any disciplinary actions taken against Howell.

{¶22} Shane Franks was a Youth Leader III at Tobin during the fall of 2005 with some supervisory capacity. Franks did not remember Reed beyond her name. Tobin did not have a policy against staff and residents being alone in an area together, unless the staff had no reason to ever be in a particular area, such as a male staff member in a female resident's private room. Residents in good standing often were allowed to help

staff members with evening kitchen cleanup and provision of evening snacks. Franks had never noticed Howell and Reed going into the kitchen with the lights off, but he would have been suspicious had he noticed. No one had ever said anything to Franks regarding anything occurring between Howell and Reed. Franks had not ever disciplined Howell, but did remember prompting Howell to act more professionally at some point, particularly in the way he talked. Any incident of Howell violating the no-touch policy was related to horseplay with the male residents only. After the November 7, 2005 report against Howell, Franks reviewed the kitchen security videos from October with Bryan, and saw one or two times when Howell and Reed entered the kitchen area with the lights off. Franks stated that had he noticed such suspicious activity at the time, he would have immediately gone to the kitchen to check on them. Franks also noted that, if anyone were to notice such activity, it would be unacceptable to do nothing.

{¶23} The depositions of the Youth Leaders Angela Burson, Rachel Morrow, Tara Stein, Heather Slaughter, and Emily Mitchell largely repeated statements by the other deponents: that there was a no-touch policy for all residents and employees, a rule against male employees being unaccompanied in the all-female wing of the facility, and a general policy for employees to avoid inappropriate situations with residents, but no policy against employees being alone with residents of the opposite sex in common areas. Most of them knew little of Howell's disciplinary history, but had heard or knew of Howell bragging about the number of women he had slept with. Some of them had known of instances when Howell and Reed were together in the kitchen, and others had not, but they all thought that it was not unusual for a staff member to be alone in the kitchen with a resident to complete evening tasks.

{¶24} With their motion for summary judgment, appellants also attached a copy of a letter from Reed to her mother, dated October 19, 2005, an affidavit of Vanderwall regarding Tobin's policies and procedures with outgoing residents' mail, a copy of Tobin's resident correspondence policy, a copy of a "Student Handbook" with guidelines and rules that Tobin residents are expected to follow, a copy of the Tobin employee schedule from September 22 to November 2, 2005, a copy of the sign-in sheet for Reed's visitors for September and October of 2005, an affidavit of Denna Bryan explaining her

investigation procedure subsequent to the November 7, 2005 report of Reed's allegations against Howell, an affidavit of Rebecca Olihan, a Unit Manager at another MCJAS facility where Reed's allegations against Howell were first reported, and a copy of Olihan's November 7, 2005 Incident Report, which included a written statement by Reed.

{¶25} Reed opposed summary judgment, arguing that the employees failed to raise the affirmative defense of statutory immunity in their answers, and failed to argue it properly in their motion for summary judgment, because the defendants only referred to immunity under R.C. 2744.02(A)(1), which only provides immunity to political subdivisions, and not R.C. 2744.03(A)(6), which provides immunity to employees. Reed further argued that the actions of the appellants rose to the level of wantonness or recklessness, and also to the level of deliberate indifference, leaving a genuine issue of material fact for both the state and federal claims. Specifically, Reed argued that Tobin staff members knew that Howell had been alone with Reed in the kitchen storage area on numerous occasions, and that staff should have taken action, regardless of whether there was or was not any specific policy forbidding male staff members from being alone with female residents. Reed noted that the defendants had 12 security cameras in the facility, and argued that the Administrator should have done more than occasionally "spot check" the monitors when time permitted. Reed argued that Howell's discipline history at MCJAS was a clear warning sign that the defendants ignored. Finally, Reed noted that she had mailed a letter discussing her relationship with Howell, and argued that the defendants should have intercepted her outgoing mail and read that letter. In support, Reed filed an affidavit regarding her understanding of the Tobin policy on outgoing resident mail, and a copy of the October 19, 2005 letter from Reed to her mother, in which Reed referenced her relationship with Howell. Reed's responsive motion references a transcript of Howell's deposition, although it was not filed with the trial court.

{¶26} Reed also filed a Civ.R. 41(A)(2) motion to dismiss her state law claims against MCJAS. Reed specified that she did not intend the motion to apply to her state law claims against any of the MCJAS employees or any other defendant, or against her federal law claims against all parties, including MCJAS. The trial court granted the motion and dismissed any state claims that applied to the political subdivision.

{¶27} The trial court granted MCJAS's motion dismissing Reed's Section 1983 claims against all parties, finding that there was no evidence in the record to indicate that the actions of the defendants rose to the level of wantonness or recklessness, or to the level of deliberate indifference. The trial court also denied MCJAS's motion regarding Reed's state claims against the employees, allowing Reed to proceed on the state tort claims, finding that the employees failed to raise immunity pursuant to R.C. 2744.03(A)(6) in the answer, and thus waived the defense.

{¶28} Pursuant to R.C. 2744.02(C), the trial court's denial of the MCJAS employees' immunity from liability constituted a final appealable order. The MCJAS employees filed a notice of appeal and Reed filed a notice of cross-appeal.

**Standard of Review**

{¶29} The trial court addressed the issues before it through summary judgment. A motion for summary judgment is properly granted if the court, upon viewing the evidence in a light most favorable to the party against whom the motion is made, determines that: (1) there are no genuine issues as to any material facts; (2) the movant is entitled to a judgment as a matter of law; and (3) the evidence is such that reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party. Civ.R. 56(C); *Byrd v. Smith,* 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, at ¶10. Only the substantive law applicable to a case will identify what constitutes a material issue, and only the disagreements "over facts that might affect the outcome of the suit under the governing law" will prevent summary judgment. *Byrd* at ¶12, quoting *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. An appellate court reviews a trial court's summary judgment decision de novo, applying the same standard used by the trial court. *Ohio Govt. Risk Mgt. Plan v. Harrison,* 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, at ¶5.

**Preservation of Affirmative Defense**

{¶30} Appellants assert in their assignment of error:

{¶31} "The finding by the trial court that the defendant employees of defendant Multi-County Juvenile Attention System except Jeffrey L. Howell have waived their right to assert the defense of governmental immunity pursuant to Chapter 2744 of the Revised

Code is erroneous as a matter of law."

{¶32} In this case, the affirmative defenses raised in the appellants' joint answer, and included by reference in their amended answer, are as follows:

{¶33} "1. MCJAS is a political subdivision engaging in a government function, to-wit: the operation of places of juvenile detention, as defined by Section 2744.01(C)(1)(h) of the Ohio Revised Code, and such [sic] has governmental immunity pursuant to Section 2744.02(A)(1) of the Ohio Revised Code.

{¶34} "2. Plaintiff's claims are barred by the applicable statutes of limitations.

{¶35} "3. Plaintiff's complaint fails to state any claims against MCJAS and the other answering Defendants, on which relief can be granted."

{¶36} The narrow issue here is whether the specific wording used by the appellants in their responsive pleading was adequate to raise the affirmative defense of statutory immunity for both MCJAS and the MCJAS employees.

{¶37} MCJAS argues that the trial court's finding that the MCJAS employees failed to raise the affirmative defense in their answer is erroneous as a matter of law, because the legal support used by the trial court to support the finding of waiver is distinguishable from the case at hand. The trial court cited three cases to support the notion that the failure to timely raise an affirmative defense waives that defense. *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 97, 98-99, 706 N.E.2d 1261(defense waived where district failed to assert in original answer, raising for first time after being reversed in an intervening appeal on another issue); *Spence v. Liberty Twp. Trustees* (1996), 109 Ohio App.3d 357, 359, 365, 672 N.E.2d 213 (defense waived where raised for first time in motion for directed verdict; Civ.R. 12(B)(6) defense does not preserve immunity defense); *Mitchel v. Borton* (1990), 70 Ohio App.3d 141, 143, 145, 590 N.E.2d 832 (defense waived as to employee who raised for first time in motion for judgment notwithstanding the verdict, unlike city which raised in answer; Civ.R. 12(B)(6) defense does not preserve immunity defense).

{¶38} Here, both MCJAS and the employees jointly filed an answer and an amended answer. In the defendants' answer, the defense of statutory immunity was explicitly raised in the section entitled "Affirmative Defenses." The MCJAS employees do

not argue that their separate Civ.R. 12(B)(6) defense acted to raise the affirmative defense of statutory immunity. Thus, although the general principle of waiver for failure to timely raise an affirmative defense applies here, the facts and resulting holdings of *Turner*, *Spence* and *Mitchel* are distinguishable from the case at hand. Moreover, it appears that the trial court cited these cases for the proposition that the concept of waiver with respect to statutory immunity of governmental entities and their employees is well established.

{¶39} Reed does argue that the defense of statutory immunity, although raised in the parties' combined answer, was only pleaded by MCJAS and not by the employees. Reed's main argument in support of her position is that the reference to statutory immunity in the parties' combined answer only cited to R.C. 2744.02(A)(1) and not to R.C. 2744.03(A)(6). The MCJAS employees argue that they satisfied the minimal notice-pleading standards of Ohio by clearly referencing the defense of statutory immunity in their answer, and did not have to be more specific in order to preserve the defense. The MCJAS employees also argue that the defense of statutory immunity applied to both MCJAS and the employees by the very nature of the jointly-filed answer.

{¶40} Pertinent to this appeal is Civ.R. 8(C), which provides that a party must affirmatively set forth any affirmative defenses in its responsive pleadings. Any affirmative defense, apart from those listed in Civ.R. 12(B), must be raised in the pleadings or in an amendment to the pleadings, or else the defense is waived. *Jim's Steak House, Inc. v. City of Cleveland* (1998), 81 Ohio St.3d 18, 20, 688 N.E.2d 506.

{¶41} The principle of waiver of an affirmative defense is to be considered within the context of the overarching principles of The Ohio Rules of Civil Procedure, which "shall be construed and applied to effect just results by eliminating delay, unnecessary expense and all other impediments to the expeditious administration of justice." Civ.R. 1(B). In the context of Civ.R. 15 motions to amend pleadings, the Ohio Supreme Court explained that one of the purposes of the Civil Rules is to allow cases to be resolved "upon their merits, not upon pleading deficiencies." *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 175, 63 O.O.2d 262, 297 N.E.2d 113.

{¶42} The purpose for requiring the timely pleading of affirmative defenses is to

avoid surprise at trial. *Thayer v. Diver*, 6th Dist. No. L-07-1415, 2009-Ohio-2053, at ¶29; *Chandler v. Gen. Motors Acceptance Corp.* (1980), 68 Ohio App.2d 30, 31, 22 O.O.3d 18, 426 N.E.2d 521, quoting McCormac, Ohio Civil Rules Practice (1970), Section 7.14, at page 159. Additionally, Civ.R. 8(F) states that the pleadings of the parties are to be "construed as to do substantial justice," which further supports the notion that pleadings should be construed in order to dispose of cases on their merits rather than technicalities.

{¶43} Reed is correct that political subdivisions generally evoke R.C. 2744.02(A)(1) to indicate that they are entitled to immunity from tort liability, and that employees of political subdivisions generally evoke R.C. 2744.03(A)(6) to indicate their immunity from tort liability. However, because the employee's immunity is only vicariously derived from the employer's status as a political subdivision, R.C. 2744.03(A)(6) is not the only portion of Chapter 2744 that would apply to the employee. Additionally, none of the cases cited by Reed support the proposition that a failure to cite the more applicable statutory subsection is fatal to a defendant's affirmative defense, with the possible exception of *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 593 N.E.2d 24.

{¶44} In *Saunders*, an inmate in a jail was severely beaten by another inmate. Id. at 49. He filed a complaint against the corrections officer on duty during the beating, and against the county sheriff. Id. The opinion of *Saunders* does not state whether the defendants raised statutory immunity in their answer, or why the trial court granted summary judgment in their favor. The language in the appellate opinion appears to indicate that the corrections officer did not raise the defense of political subdivision employee statutory immunity, and that the sheriff somehow only addressed his liability through the lens of vicarious liability. Id. at 50-51. The sheriff apparently argued that he had immunity from any negligent harm caused by his employee pursuant to R.C. 2744.02 because he qualified as a political subdivision. Id. at 51.

{¶45} The Eighth District held that a sheriff did not constitute a political subdivision, and concluded that the sheriff therefore was not entitled to immunity. Id. at 51-52. For some unexplained reason, the appellate court did not address the fact that even in his supervisory role over employees, the sheriff himself was an employee of the political subdivision, not some separate administrative body as implied by the appellees'

argument.

**{¶46}** Reed would have this Court infer that the Eighth District did not address the issue of the sheriff's status as a government employee because the sheriff had waived the issue by failing to raise it. However, such a statement is not found anywhere in the opinion. The Tenth District appears to have interpreted the Eighth District's holding to imply that R.C. Chapter 2744 did not apply to the sheriff at all, and concluded that this portion of the Eighth District's opinion was erroneous, noting that the duties of a sheriff fall under police services, which is clearly a governmental function. *Williams v. Franklin Cty., Ohio Sheriff's Dept.* (1992), 84 Ohio App.3d 826, 830, 619 N.E.2d 23. Moreover, regardless of what the persuasive value of *Saunders* may be, it still does not resolve the question of whether the failure to accurately cite a statute is fatal to an affirmative defense raised in a party's responsive pleadings.

**{¶47}** Pursuant to the liberal pleading requirements of Civ.R. 8, the pleadings of the parties to an action need only be in general terms. A defendant's answer is subject to the same notice-pleading standards as a plaintiff's complaint, and an affirmative defense is generally adequate as long as the plaintiff receives fair notice of the defense. Civ.R. 8(C), 1970 staff notes. If a party raises a "generic" defense in its answer, it is acceptable to make fair interpolations of more specific defenses that might naturally be included in that defense. *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 432-433, 659 N.E.2d 1232. However, it is unacceptable to extrapolate from a defendant's affirmative defenses to include something that is simply not stated in the pleadings. *Thayer* at ¶33; *Carmen v. Link* (1997), 119 Ohio App.3d 244, 249, 695 N.E.2d 28.

**{¶48}** Thus, we reject Reed's argument that the failure to cite a specific statute constitutes waiver of a defense contained in that statute. Waiver for that reason alone would dispose of the case on a technicality rather than on its merits.

**{¶49}** However, when looking at the appellants' defenses together, the citation to R.C. 2744.02(A)(1) with no mention of R.C. 2744.03(A)(6) does support the argument that only MCJAS intended to raise the defense of statutory immunity. The first defense in the joint answer only identifies MCJAS as raising the immunity defense, and does not mention "employees" or "other answering defendants." However, the third defense,

failure to state a claim, identifies both MCJAS and "the other answering Defendants." By explicitly including the employees in the third defense and failing to include them in the first defense, along with a citation to the specific portion of R.C. Chapter 2744 that provides immunity for political subdivisions instead of a more inclusive manner of citation, the answer has indicated that only MCJAS intended to raise the affirmative defense of statutory immunity.

**{¶50}** The same conclusion was reached on similar facts in *Krieger v. Cleveland Indians Baseball Co.*, 176 Ohio App.3d 410, 2008-Ohio-2183, 892 N.E.2d 461 (reversed on other grounds). In *Krieger*, the appellees commenced an action against the City of Cleveland, Police Detective Peachman, and other defendants, alleging false imprisonment, malicious prosecution, slander, negligence, and intentional infliction of emotional distress, stemming from the appellees' arrest for alleged involvement in an explosion that occurred at a baseball park. Id. at ¶18. The city and Peachman filed separate answers, both raising the affirmative defense of statutory immunity. Id. at ¶26. Later in the proceedings, the city and Peachman jointly filed an amended answer, which stated that Peachman claimed immunity pursuant to R.C. Chapter 2744, but did not state elsewhere that the city also claimed statutory immunity. Id. at ¶28.

**{¶51}** The Eighth District held that the city waived the defense of statutory immunity. Id. at ¶33, citing *Turner* at 98. ("It was perfectly reasonable for appellants to assume that in the absence of [appellee's] failure to assert this defense, and its failure to argue this issue in its first motion for summary judgment, it intended to waive the defense."). Thus, even in a jointly filed answer, if only one of the defendants is named regarding a particular defense, it is reasonable to assume that the unnamed defendant did not intend to raise the defense. *See also, O'Brien v. Olmsted Falls,* 8th Dist. Nos. 89966, 09336, 2008-Ohio-2658, at ¶13 (Under Civ.R. 8(C) defendant required to set forth affirmative defenses which would effectively preclude liability, and failure to do so waives the defense, including immunity).

**{¶52}** The MCJAS employees were not entitled to summary judgment based on their statutory immunity, as they waived the defense by failing to raise it in the amended answer. Accordingly, Appellants' first assignment of error is meritless.

{¶53} In their conditional assignment of error, Appellants assert:

{¶54} "The trial court's failure to grant summary judgment in favor of the defendant employees of the Multi-County Juvenile Attention System is erroneous as a matter of law."

{¶55} Because we have held that Appellants' assignment of error is meritless, this issue is moot.

### Qualified Immunity from Section 1983 Claims – Deliberate Indifference

{¶56} Turning to Reed's cross-assignment of error, she asserts:

{¶57} "The trial court erred when it found MCJAS and Appellants were entitled to qualified immunity on Reed's federal claims."

{¶58} Reed argues that the trial court should not have granted summary judgment against her Section 1983 claim against both MCJAS and the employees, because there remained a question of fact as to whether any of them acted with deliberate indifference to Reed's safety and well being.

{¶59} The pertinent part of Section 1983, Title 42, U.S. Code states:

{¶60} "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * *, subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *."

{¶61} A Section 1983 action can be brought against government officials. *Jett v. Dallas Indep. School Dist.* (1989), 491 U.S. 701, 723-724, 109 S.Ct. 2702, 105 L.Ed.2d 598. States and their instrumentalities are not "persons" within the meaning of Section 1983 and are immune from suit. *Burkey v. Southern Ohio Correctional Facility* (1988), 38 Ohio App.3d 170, 171, 528 N.E.2d 607. However, a local government may be found liable under Section 1983 when the execution of one of its policies or customs inflicts injury by violating an individual's rights. *Monell v. Dept. of Soc. Serv. of City of N.Y.* (1978), 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611. The parties have not contested that MCJAS constitutes a person within the meaning of Section 1983.

{¶62} The trial court held that the affirmative defense of qualified immunity barred

Reed's Section 1983 claims against Appellants. Qualified immunity protects "government officials performing discretionary functions * * * from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton* (1987), 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523. To overcome the appellants' qualified-immunity defense, Reed must establish that the appellants' conduct violated a constitutional right and that the right was clearly established. *Hope v. Pelzer* (2002), 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666.

**{¶63}** Reed claimed that her rights under the Eighth and Fourteenth Amendments were violated by the appellants' failure to protect Reed from Howell's sexual assaults. The Eighth and Fourteenth Amendment protections from cruel and unusual punishment require that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan* (1994), 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811. These constitutional claims are frequently raised in the context of prisons, but have also been applied to juvenile detention facilities. See, e.g., *Gregg v. Ohio Dept. of Youth Services* (S.D. Ohio 2009), 661 F.Supp.2d 842, 854-856; *Little v. Corr. Corp. of America* (C.A.6 2004) 103 Fed.Appx. 898; *Thacker v. Franklin Cty., Ohio* (June 21, 1994), 10th Dist. No. 94APE01-10. Although prison officials are responsible for an inmate's reasonable safety, a particular failure to prevent harm may only rise to the level of a constitutional violation if the official was deliberately indifferent to a substantial risk of serious harm to the inmate. *Farmer* at 834. Whether there was a substantial risk of harm is an objective inquiry, and whether an actor was deliberately indifferent is a subjective inquiry. Id.

**{¶64}** Appellants do not contest the objective component of Reed's claim, arguing that Reed failed to show that any of Appellants were subjectively aware of the risk of Howell's alleged sexual assaults against Reed. Thus, the focus of this appeal is whether Reed has alleged facts that, when viewed in a light most favorable to her, could conceivably support a finding that any of the Appellants had knowledge of the risk of the alleged harm, inferred the risk, and disregarded it.

**{¶65}** The concept of deliberate indifference is comparable to the criminal mens

rea of recklessness. *Farmer* at 839. The subjective portion of the inquiry has three steps. First, it must be shown that the official subjectively perceived "facts from which the inference could be drawn that a substantial risk of serious harm exists." Id. at 837. Second, it must be shown that the official actually drew that inference, not merely that he should have done so. Id. at 839. Third, it must be shown that the official consciously disregarded the perceived risk. Id.

{¶66} Reed's allegations of deliberate indifference seem to fall into two categories. The first category involves deliberate indifference at the individual level, by each employee's failure to take action against the obvious risk of harm to Reed. The second category involves deliberate indifference at the institutional level, by the failure to have adequate rules or adequate supervision, allegedly creating the risk of harm.

{¶67} As for the first category, Reed argues that Howell's supervisors and fellow employees were deliberately indifferent to Reed's rights by not monitoring her more closely, by being aware of Howell's disciplinary history, by knowing that Howell was in the kitchen alone with Reed on certain occasions, by knowing that their presence in the kitchen was in violation of an MCJAS policy prohibiting employees from being alone with residents of the opposite sex, and by knowing of the instructions to male staff not to be alone specifically with Reed.

{¶68} Reed contends that her case is similar to *Kahle v. Leonard* (C.A.8, 2007), 477 F.3d 544, where qualified immunity was denied via summary judgment. In *Kahle*, a jail supervisor, Malone, was directly in charge of a new correctional officer trainee, Leonard, during his training at the jail where Kahle was detained. Malone was to watch Leonard closely, and ensure that he did not do anything inappropriate. Id. at 547. Malone was also in charge of the shift log in Kahle's cell block. If any cell door opened after lockdown, a light at the cell block's work station would turn from green to red, and whoever was at the work station was charged with noting that event in the shift log. Id. at 548. No one was supposed to enter an inmate's cell after lockdown. Id. at 552. On one evening between 10:00 and 11:00 p.m., after lockdown, Leonard entered Kahle's cell three times, for a few minutes at a time, and sexually assaulted her. Id. at 548. During one of the assaults, Leonard's CB radio was set off. Id. Throughout that hour, Malone

was sitting at the cell block work station. Id. Before each of the three assaults, Leonard informed Malone that he was going to Kahle's cell. Id. The light for Kahle's cell, located on a panel at the work station where Malone was sitting, would have shone red for the entire length of each time that Leonard was in Kahle's cell. Id. Kahle, Leonard and the County Sheriff all testified that Malone had a view of Kahle's cell from the work station. Id. Kahle also testified that Malone looked up during Leonard's second assault, when Leonard's CB radio was accidentally set off. Id.

{¶69} Malone claimed that he could not and did not see anything in Kahle's cell, and that he did not see her cell light turn red as he was sitting at the work station. Id. at 548, 552. Malone claimed that he was not subjectively aware that Kahle was being sexually assaulted. The court noted that Malone did not have to see the actual harm of sexual assault being committed in order to meet the deliberate indifference standard, and only had be aware of the conduct that could give rise to the risk of harm. Id. at 551-552. The Eighth Circuit found that a jury could find that Malone was aware of a substantial risk of serious harm to Kahle because he knew that there was no reason to go to Kahle's cell after lockdown, he knew that Leonard was a new trainee, and he knew that Leonard went to Kahle's cell three different times, for minutes at a time, and further, because Kahle raised a genuine issue of material fact as to whether Malone noticed the red light at the desk where he was sitting, and as to whether Malone looked up and saw Leonard in Kahle's cell during the second assault. Id. at 552. The Eighth Circuit concluded that Malone was not entitled to qualified immunity, and affirmed the summary judgment denial of Malone's motion. Id. at 554.

{¶70} *Kahle* is distinguishable from the case at hand for a number of reasons. The supervisor in *Kahle* perceived a number of facts that indicated a substantial risk of harm, and Kahle's evidence indicated that the supervisor knew that Leonard was actually inside her cell for minutes at a time, and looked up to see Leonard in the cell during one of those times. The fact that the supervisor may have had actual knowledge of Leonard's actions, which, in that context, had no explanation, was strong circumstantial evidence that the supervisor inferred the substantial risk and turned a blind eye. Unlike *Kahle*, in this case there was no employee or supervisor who was stationed near the kitchen

cooler, charged with monitoring every time the cooler was entered, to whom Howell reported each time before going to the cooler with Reed. Additionally, in *Kahle*, there was no reason for an employee to go to a prisoner's cell at night after lockdown, whereas here, all parties testified that it was a normal task for an employee and a resident to enter the kitchen cooler in the evening to prepare snacks or clean up. Because of the many differences in the facts and circumstances, *Kahle* does not support Reed's argument.

{¶71} Reed's argument does not get past the first step of the inquiry. Reed points out that the employees and supervisors did not notice Howell's activities on the video monitors, and failed to read a letter that Reed sent to her mother. Reed argues that the MCJAS employees *should* have noticed Howell's pattern of activity through closer monitoring, but does not claim that any of the employees actually read Reed's letter or witnessed all of the eight occasions during which Howell and Reed entered the kitchen cooler together, or either of the two instances when they did so after turning the lights off in the kitchen. Thus, it cannot be said that the employees actually perceived many of the facts that might have indicated that Reed faced a substantial risk of harm.

{¶72} Additionally, Reed is supporting some of her factual statements in her brief with citations to Howell's deposition which was not filed in the proceedings below and thus is not a part of the record before this court. "An appellate court is limited to reviewing the official record that was before the trial court. *State v. Saltzer* (1984), 14 Ohio App.3d 394, 395, 471 N.E.2d 872; App.R. 9. These documents were not presented to the trial court, and will not be considered on appeal." *Wilhelm v. Foster*, 7th Dist. No. 03 MA 29, 2004-Ohio-5928, at ¶15.

{¶73} The facts alleged to have been perceived by various employees are: Reed and Howell being alone in the kitchen cooler together, reports of Howell bragging to other employees about the number of women he had slept with, and Howell being disciplined for rude behavior during staff meetings, breaking a cabinet door, for a DUI, and for two incidents of roughhousing with certain male juveniles. Reed also alleged that there was a policy forbidding male employees from being alone with female residents at any time, and thus that the employees knew that Howell was alone with Reed in violation of the policy.

{¶74} MCJAS did not have any written policy against employees being alone in

any situation with a resident of the opposite sex. All of the MCJAS employees stated during their depositions that there was no official policy, and that a policy of that sort only existed in so far as the employees were to avoid any compromising situations with the residents. However, the December 5, 2005 pre-disciplinary hearing report written by Vanderwall implies the existence of some form of policy:

{¶75} "I questioned if Ms. Bryan the administrator had ever talked to the staff including him concerning the need for accountability and the fact that a male staff should never be alone with a female resident. [Howell] stated that this was discussed and that this female resident was discussed in particular because she had made accusations in the past. I questioned again why he would be alone with her knowing that male staff had been instructed not to be alone with any female youth."

{¶76} Vanderwall explained that the above statement related to employees being instructed not to put themselves in compromising situations, for their own safety, not because there was an absolute rule forbidding male employees from being alone with female residents. Vanderwall also explained that employees had been specifically instructed to avoid such situations with Reed because she was believed to have made and threatened to make false accusations of sexual misconduct in the past. Thus, the specific instructions regarding Reed were only related to the risk of harm to the employees, and not any risk of harm to Reed

{¶77} Irrespective of Vanderwall's explanation, it seems that the written statement, when viewed in a light most favorable to Reed, could indicate that there was in fact a policy prohibiting male employees from being alone with female residents. However, all of the employees testified that they did not know of any official policy prohibiting male employees from ever being alone with female employees. Thus, even if there was some policy, none of the employees were subjectively aware of it. Moreover, even if there was a policy being violated, it does not seem to follow that the existence or disregard of a policy, in and of itself, would "establish an obvious risk that females left alone with male guards are likely to be assaulted." *Hovart v. Robinson* (C.A.10 1993), 1 F.3d 1063, 1068. Without some kind of knowledge that Howell posed a sexual threat to female residents, the only known risk would come from the mere fact that Howell is a

male. See Id. "To find harm present in these circumstances would, in effect, require the conclusion that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone." Id.

{¶78}  Regardless of any policy, it could still be possible for the employees to perceive a substantial risk of harm to Reed if they witnessed Howell engaging in a pattern of activity that put Reed at such risk. However, none of the supervisors could recall any particular time Howell and Reed were in the kitchen alone together, and the administrator and director did not have any first hand awareness of Howell and Reed being alone in the kitchen together. And they all stated that it would not have been unusual for an employee and resident to work alone together in the kitchen, and that there was no policy against it.

{¶79}  As for Howell's fellow employees, Tara Stein and Emily Mitchell did not know of Howell and Reed being in the kitchen alone together. None of the employees knew of Howell and Reed being together in the kitchen with the lights off. Heather Slaughter remembered a few occasions when Howell and Reed were in the kitchen together, cleaning or setting up, but did not remember anything significant about those instances. Slaughter stated that, in general, employees and residents performed tasks alone together in the kitchen as part of a nightly procedure. Rachel Morrow reported knowing of one time that Howell and Reed were in the kitchen cooler together; she saw them in the kitchen taking expired food out from the cooler and loading it onto a cart. She assumed they were performing a routine task together, as it was normal to do things in the kitchen, like sort out expired food, during that time of the evening. Angela Burson reported knowing of one time that Howell and Reed were in the kitchen together; when Burson was looking for Reed, she heard the sound of boxes being thrown down in the kitchen, then found Howell and Reed walking up the hall in the kitchen, and assumed that they had been stocking and putting things away in the kitchen.

{¶80}  Given all of the evidence in the record, any knowledge by employees of Howell being in the kitchen with Reed was accompanied by the inference that Howell and Reed were performing routine tasks. Thus, no evidence was presented that indicated that any of the employees actually drew the inference that there was a substantial risk of harm to Reed due to Howell and Reed being in the kitchen together.

**{¶81}** Finally, Reed alleges that the employees were aware of Howell's disciplinary history for misconduct at Tobin, and that the instances of misconduct were "clear warning signs." Although Reed stresses that Howell's disciplinary history should have been a red flag that Howell did in fact pose a risk to Reed, Howell's history did not include any incidents of sexual misconduct. Howell had been disciplined in the past for breaking a cabinet door, one instance of horseplay with a male resident, one instance of unnecessarily restraining a noncompliant male resident, and for an OVI arrest that occurred while Howell was not working. A few employees stated that Howell did not seem the same when he returned from active military duty in Iraq. Some stated that they knew Howell had a problem with drinking outside of work, but that it did not affect his work. Many stated that when the employees were together on break, Howell would brag about his sexual conquests with women. Mitchell reported an instance where a male resident told her that Howell had told him that all of the female employees at Tobin "wanted him."

**{¶82}** The only thing sexual in nature are reports of Howell bragging to fellow staff members on break that he had slept with a lot of women, and one known instance of making inappropriate comments about female employees to a male resident. None of the evidence presented indicates that any of the employees inferred that there was a substantial risk that Howell would sexually assault Reed from the fact that Howell bragged about his sexual prowess in regards to adult women.

**{¶83}** Looking at all of these facts in a light most favorable to Reed, she has not alleged facts that could support the conclusion that any of the appellants actually knew of facts that might indicate that Reed faced a substantial risk of harm, inferred that Reed faced such a risk, and nonetheless disregarded it. Accordingly, this first part of Reed's argument is meritless.

**{¶84}** As for the second category, counties, local governmental bodies, and other policymakers cannot be liable under Section 1983 under the doctrine of respondeat superior, and instead may only be found liable for their hand in creating a custom or policy that *caused* the plaintiff's injury. *Board of Cty Commrs. of Bryan Cty. v. Brown* (1997), 520 U.S. 397, 403-404, 117 S.Ct. 1382, 137 L.Ed.2d 626. "[I]it is not enough for

a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 404.

{¶85} Thus, institutional or policy-maker action or inaction must not only be done in the face of an obvious risk of harm, but the action or inaction of the institution must have had some causal relationship with the harm, in order for it to qualify as deliberate indifference. Such deliberate indifference might be found in inadequate hiring, training, or supervision in light of obvious consequences of those inadequacies. See *City of Canton, Ohio v. Harris* (1989), 489 U.S. 378, 388-390, 109 S.Ct. 1197, 103 L.Ed.2d 412; *Mize v. Tedford* (C.A.6 2010), 375 Fed.Appx 497, 500.

{¶86} Reed has not presented any argument to support the contention that Howell was improperly hired or inadequately trained. Reed may be implying a claim of inadequate supervision by stating that MCJAS failed to require that an employee regularly monitor the surveillance cameras, failed to enforce an alleged policy of reviewing all outgoing mail, and failed to require employees to closely supervise Howell in light of his disciplinary history.

{¶87} In *Mize*, the appellant argued that the employee who had raped her might not have had the opportunity to do so had he been more closely monitored. *Mize* at 501. The Sixth Circuit agreed, but explained that "opportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference. At best, it establishes negligence, which 'will not suffice.'" Id., quoting *Brown* at 407. A higher standard than negligence is required, because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton,* at 392. Similarly here, Reed has only established that closer supervision of Howell could have prevented the alleged sexual assaults. Reed has not provided any causal link that would indicate MCJAS's liability, i.e. that MCJAS's

failure to constantly monitor cameras, read all mail, and closely monitor employees with disciplinary histories caused the predictable consequence of a resident being sexually assaulted.

{¶88}    As an additional argument, Reed also claims that MCJAS was deliberately indifferent by failing to have an official policy that prohibited male staff from being alone with female residents.  Again, Reed has not provided any causal connection between this policy and the harm that allegedly occurred.  The failure to have this specific policy does not constitute a "moving force" behind the harm alleged, especially in light of the existence of MCJAS's other policies prohibiting abuse, touching, or any inappropriate behavior towards residents.  See *Brown* at 404.

{¶89}    Looking at the facts in a light most favorable to Reed, it does not support a finding that MCJAS or any defendants at the policy-making level enacted or failed to enact any policies that foreseeably caused the alleged harm.  Accordingly, the second portion of Reed's argument is meritless.

{¶90}    There is no evidence to indicate that the actions or inaction of MCJAS or its employees constituted deliberate indifference to Reed's safety and well being.  The assaults allegedly committed by Howell were prohibited by MCJAS policy, and were not otherwise encouraged or caused by any other MCJAS policy or custom.  There is no evidence that any of the employees knew of facts that indicated that Howell or any other employee posed a substantial risk to Reed, let alone drew such an inference.  Nor did any of Howell's alleged assaults occur in such a blatant or open manner as to constitute circumstantial evidence, as in *Kahle*, that any employee must have been aware of the risk.  Accordingly, Reed did not overcome the appellants' qualified immunity defense, and Reed's first assignment of error is meritless.

{¶91}  Reed asserts as a conditional assignment of error:

{¶92}  "The trial court erred when it found that Reed failed to establish a genuine issue of material fact as to whether Appellants acted recklessly or wantonly."

{¶93}    As with appellants' conditional assignment of error, Reed's conditional cross-assignment of error is moot because we have concluded the trial court correctly found that the employees waived the immunity defense.

{¶94}    In conclusion, the MCJAS employees waived the immunity defense by failing to properly raise it in their answer and amended answer.  Further, there was no genuine issue of material fact regarding the deliberate indifference of MCJAS or its employees to the alleged sexual assaults committed by Howell.  Accordingly, the judgment of the trial court is affirmed.

Vukovich, P.J., concurs.

Donofrio, J., concurs.