[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11606
Non-Argument Calendar
_____

D.C. Docket No. 6:14-cv-00936-CEM-TBS


WILLIAM A. WHITE,

                                              Plaintiff - Appellant,

versus

WILLIAM BERGER, SR.,
ERIC THOMPSON,
DONALD ESLINGER,
RONALD SHAW,
SEMINOLE COUNTY, FLORIDA,

                                              Defendants - Appellees,

JOSEPH KLINGER, et al.,

                                              Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(September 15, 2017)

Before HULL, WILSON and JILL PRYOR, Circuit Judges.

PER CURIAM:

William White, proceeding *pro se*, appeals the district court's dismissal of his claims that defendants William Berger, Sr., Eric Thompson, Donald Eslinger, Ronald Shaw, and Seminole County, Florida violated his constitutional rights by confining him in unduly harsh isolation conditions.  On appeal, White argues that the district court erred in dismissing his claims against Berger and Thompson on qualified immunity grounds, against Seminole County for failure to adequately plead municipal liability, and against Eslinger and Shaw for failure to exhaust administrative remedies.  After careful review, we affirm the district court's judgment with regard to Berger, Thompson, and Seminole County, but vacate the judgment as to Eslinger and Shaw.

## I.    BACKGROUND

White is a federal inmate who was previously incarcerated at the John E. Polk Correctional Facility (the "prison") in Seminole County, Florida.  The prison is owned and operated by Seminole County.  White filed suit against two United States Marshals (defendants Berger and Thompson), two Seminole County law enforcement officials (defendants Eslinger and Shaw), and Seminole County itself, alleging that he was subject to inhumane and unconstitutional conditions of confinement while he was held in isolation at the prison.  According to White's

2

third amended complaint (the "complaint"), although he was a federal inmate for whom the U.S. Marshals were responsible, he was placed at the prison under a contract between the United States Marshals Service ("USMS") and Seminole County.

White alleged that he was placed in an isolation unit at the prison after he declined a plea offer in a pending criminal matter. According to the complaint, White's first isolation cell was 7 feet by 7 feet, had an open sewage drain in the floor that functioned as a toilet, and was continuously filmed by a video camera that broadcast live footage of the cell to a public area of the facility at all times, even when White was using the sewage drain. The cell contained a bed made of cinderblock, had no windows, and was growing mold. It also featured two painfully bright double-bulbed lights that were left on 24 hours a day. While in isolation, White was permitted no more than three hours of outside recreation and only two showers each week. He would go weeks or months without a shave or haircut.

White further alleged that he spoke to Shaw seeking to remedy his harsh confinement conditions. Shaw informed him that Berger and Thompson were directing him, Eslinger, and Seminole County to maintain those conditions. Thompson, by contrast, told White's attorney that Eslinger, Shaw and the County were in control of White's treatment. After receiving disciplinary action for

3

calling his housing conditions stupid, White was transferred to a new cell and threatened by a corrections officer who drew a taser, threatened to torture White, and made sexual threats. The corrections officer was suspended for two weeks as a result of these acts.

White alleged that as a result of this mistreatment, he rapidly lost weight (51 pounds in total), suffered physical pain in his head and eyes, and was unable to sleep. He was unable to eat or drink water for a week. At one point, he was transferred to a medical unit, where he was advised that he may have suffered kidney and liver damage. White also developed rickets, which caused chips to fall off his teeth as a result of a lack of exposure to sunlight. The medical staff advised corrections officers that the conditions in the isolation units were endangering his health, but the prison staff only intensified their torture of White when he returned. White was thereafter denied all outside recreation and ability to communicate with counsel. In total, White was in isolation for six months before being transferred out.

Also, according to the complaint, Berger, the U.S. Marshal for the Middle District of Florida, was aware of conditions in the isolation units because the USMS contracted with Seminole County for the housing of federal prisoners at the facility. In addition, Berger was aware of the conditions because White sent Berger a letter informing him of them. White further alleged that Thompson, the

4

Supervising Deputy U.S. Marshal for the Orlando office, was "personally aware" of the isolation conditions and "personally direct[ed], in conjunction with the other defendants, that . . . [White] be housed" in those conditions.  Third Amended Compl., Doc. 79 at 8.[1]  Eslinger, the Sheriff of Seminole County, "personally authorized both the [isolation] conditions . . . and, the infliction of those conditions specifically upon [White]."  *Id.*  Shaw, the Captain in charge of security at the facility, "personally discussed and reached an agreement with [] Eslinger and [] Thompson to" subject White to harsh conditions, and Shaw "personally committed and directed others" to do so.  *Id.*  According to the complaint, Shaw explicitly discussed his role in White's treatment with White.

White filed suit against Berger, Thompson, Eslinger, Shaw, and Seminole County, alleging that his conditions of confinement violated the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  White's First Amendment claims were based on a conversation in which Shaw allegedly told White that he was being mistreated because of his "First Amendment speech associations, and/or religious views."  *Id.* at 10.  The district court treated the *pro se* claims against Berger and Thompson as though they were raised under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), while treating the remaining claims as though they were raised under 42 U.S.C. § 1983.  The district court dismissed with

---

[1] Citations to "Doc. __" refer to numbered docket entries in the district court record in this case.

prejudice the claims against Berger, Thompson, and Seminole County for failure to state a claim, and dismissed without prejudice the claims against Eslinger and Shaw for a failure to exhaust administrative remedies under the Prisoner Litigation Reform Act (PLRA), 42 U.S.C.A. § 1997e.[2]  White now appeals.

## II.    STANDARD OF REVIEW

We review a district court's decision granting a motion to dismiss *de novo*. *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1357 (11th Cir. 2016).  In doing so, we accept the well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).

We review *de novo* a district court's interpretation and application of the PLRA's exhaustion requirement.  *Dimanche v. Brown*, 783 F.3d 1204, 1210 (11th Cir. 2015).  We review the district court's factual findings regarding exhaustion for clear error.  *Id.*  A factual finding is clearly erroneous only if this court, after reviewing all of the evidence, is left with the definite and firm conviction that a mistake has been made.  *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008).

---

[2] The facts relevant to White's efforts to exhaust administrative remedies are discussed in Section III.C, *infra*.

6

## III.    DISCUSSION

### A.    Claims Against Berger and Thompson

In *Bivens*, the Supreme Court determined that federal officials may be sued directly under the Constitution for violations of an individual's constitutional rights.  403 U.S. at 397.  Like state officials sued under 42 U.S.C. § 1983, federal officials sued under *Bivens* may raise the defense of qualified immunity.  *See Wilson v. Blankenship*, 163 F.3d 1284, 1288 (11th Cir. 1998).  In determining whether government officials acting in their discretionary capacity are entitled to qualified immunity, we ask whether the officials violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Braddy v. Fla. Dep't of Labor & Emp't Sec.*, 133 F.3d 797, 801 (11th Cir. 1998) (internal quotation marks omitted).

The district court granted qualified immunity to Berger and Thompson on White's *Bivens* claims because White failed to plead their personal participation in any violation of his constitutional rights.  On appeal, White does not argue that he properly pled Berger and Thompson's personal participation in his mistreatment; instead, he argues that *Bivens* permits claims against federal officials analogous to claims against individuals raised under 42 U.S.C. § 1986, which does not require that defendants have personally participated in constitutional violations.  In White's view, the district court should not have dismissed his claims against

7

Berger and Thompson because he adequately pled their neglect in preventing the alleged conspiracy, a claim under § 1986.  For the reasons that follow, we disagree.[3]

> Section 1986 provides:
>
> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

Section 1986 claims are derivative of claims raised under 42 U.S.C. § 1985, permitting liability against individuals who are aware of—but did not participate in—a conspiracy prohibited by § 1985, and failed to take action to stop the conspiracy.  *Park v. City of Atlanta*, 120 F.3d 1157, 1159-60 (11th Cir. 1997).  Section 1985(3)—the portion of § 1985 that most closely tracks White's allegations—in turn prohibits "two or more persons" from conspiring to "depriv[e], either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  For a

---

[3] Berger and Thompson argue that White has waived his § 1986 argument by failing to raise it in the district court.  While White did not specifically identify § 1986 in his response to Berger and Thompson's motion to dismiss, he did assert that Berger and Thompson had personal knowledge of a conspiracy to confine him in unconstitutional conditions and failed to take any action to relieve those conditions.  Construing White's *pro se* response liberally, as we must, we find that White's argument below is sufficiently similar to the kind of liability envisioned by § 1986 that he has not waived his argument for purposes of this appeal.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed." (internal quotation marks omitted)).

conspiracy to be actionable under § 1985(3), it must "be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Park*, 120 F.3d at 1162 (internal quotation marks omitted).

Assuming for purposes of this case that *Bivens* permits § 1986 analogue claims, we conclude that White has not stated such a claim because he has not adequately pled that his treatment was motivated by racial or other class-based animus. *Id.* Section 1985(3) does not permit liability for conspiracies based on *any* discriminatory motive. Rather, it protects individuals from conspiracies to harm them motivated by their membership in "classes having common characteristics of an inherent nature—i.e., those kinds of classes offered special protection under the equal protection clause." *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1147 (11th Cir. 1996). Liability under § 1985(3) requires "something more" than the plaintiff's membership in a "group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).

The complaint makes only a conclusory allegation that White was subjected to harsh conditions in the isolation unit because of his political speech and religious views. While § 1985(3) may protect against conspiracies motivated by religious discrimination, White has not plausibly pled that he was mistreated based on his religion. The complaint does not even identify the religious beliefs that

9

supposedly resulted in White's mistreatment, nor does it identify any individuals who harbored animus against him for his religious beliefs. White's only factual allegation with regard to religious discrimination is that Shaw told him that he was being treated as he was "in part" because of his "First Amendment speech associations, and/or religious views." Third Amended Compl., Doc. 79 at 10. With regard to religious discrimination, the complaint lacks "facial plausibility" because it does not contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because White has not adequately pled the existence of a conspiracy to harm him cognizable under § 1985(3), his assertion that he has adequately pled a § 1986 analogue claim under *Bivens*—to the extent such a claim is even permitted—fails. We therefore affirm the district court's dismissal of his claims against Berger and Thompson.

**B.    Claims Against Seminole County**

White next challenges the district court's dismissal of his claims against Seminole County. Claims brought under § 1983 are subject to limitations on municipal liability. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). Municipal liability under § 1983 obtains only where "the municipality has officially sanctioned or ordered" the constitutional violation at issue. *Id.* (internal

quotation marks omitted).  A municipality may be liable for an official policy enacted by its legislative body, or where its policymakers have acquiesced in a longstanding standard operating procedure, or where an entity with "final policymaking authority" ratifies the unconstitutional decision of a subordinate.  *Id.* (internal quotation marks omitted).  Although a plaintiff need not identify a final policymaker at the pleading stage, a plaintiff must "allege a policy, practice, or custom of the [municipality] which caused" the constitutional violation.  *Id.* at 1280.

The district court dismissed White's claims against Seminole County because the complaint did not allege any "policy, practice, or custom" that resulted in White's mistreatment.  On appeal, White argues that he was not required to plead a "policy, practice, or custom" of the County because his mistreatment was the natural consequence of the County's construction of a prison containing isolation cells with no windows, bright lights that could not be turned off, sewage drains in lieu of toilets, and a video camera system that broadcast the cells to the public.  There are, however, no exceptions to the "policy, practice, or custom" requirement for municipal liability.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("We hold that municipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing

11

final policy with respect to the subject matter in question."). However, a singular action taken by a government official can constitute an official policy giving rise to municipal liability if the official has final policymaking authority for the municipality. *See, e.g.*, *id.*

Reframed properly, then, White's argument is that the County's construction of the isolation chambers itself was an official government policy that caused a violation of White's constitutional rights. The problem with White's argument is that—even assuming the decision to construct the isolation chambers was made by an individual with final policymaking authority—the complaint does not suffice to meet the strict causation standard applicable in municipal liability cases. "Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 408 (1997). A plaintiff must, therefore, allege that his injury "flows from the municipality's action, rather than from some other intervening cause." *Id.* at 409. To prevent municipal liability "from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's [allegedly] inadequate decision and the particular injury alleged." *Id.* at 410.

Here, mere construction of the isolation units is insufficient to support a claim of municipal liability.  Legitimate law enforcement functions support virtually all of the cells' features.  The presence of a camera in the cells and the need for constant lighting, for example, can be important for the prison to monitor particularly dangerous inmates at all hours.  *See, e.g., Bass v. Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999) (holding that placement of plaintiffs in solitary confinement with no outdoor exercise time, though harsh, was a rational and constitutional "response to the substantial threat posed by the plaintiffs").  Although we have concerns about White's allegations, which we must take as true at this stage of the proceedings, that his cell was being broadcast to a public area of the prison, the complaint contains no facts suggesting that those broadcasts were a function of the prison's construction.  Liberally construing White's pleadings, then, the crux of his claims is that these conditions were gratuitously imposed upon him even though he posed none of the risks the isolation units might have been designed to contain and that the defendants were deliberately indifferent to the harmful effects isolation had on him.  As alleged, the "moving force" behind the alleged constitutional deprivation was not the construction of the isolation cells— the features of which may well have had legitimate purposes—but was instead the decision of certain individuals to use the isolation cells to inflict extreme and unnecessary punishment on White.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

13

694 (1978).  The district court therefore properly dismissed White's claims against Seminole County.

## C.    Claims Against Eslinger and Shaw

Finally, the district court dismissed White's claims against Eslinger and Shaw for a failure to exhaust administrative remedies.  Under the PLRA, a prisoner may not file a § 1983 action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  When a state provides a grievance procedure for prisoners, an inmate alleging that he has suffered from illegal prison conditions must file a grievance and exhaust the remedies available under the state's procedure before pursuing a § 1983 suit.  *Dimanche*, 783 F.3d at 1210.  Under the PLRA, an inmate must *properly* exhaust administrative remedies, meaning he must comply with the "critical procedural rules" governing the grievance process.  *Id.* (internal quotation marks omitted).  Nonetheless, a remedy must be "available" before it must be exhausted, and to be available, a remedy must be "capable of use for the accomplishment of [its] purpose."  *Id.* (alteration in original) (internal quotation marks omitted).

A defense of failure to exhaust administrative remedies under the PLRA is treated as a matter in abatement, and deciding such a motion is a two-step process: First, if the court determines from the plaintiff's version of the facts that the plaintiff has failed to exhaust his remedies, then the case must be dismissed.  *Id.*

14

Second, if the complaint is not subject to dismissal at the first step, then the court must make specific findings to resolve the disputed factual issues related to exhaustion. *Id.* Once the court makes such findings, it then decides whether the prisoner has exhausted available administrative remedies.[4] *Id.* The burden of proving a failure to exhaust is on the defendants. *Dimanche*, 783 F.3d at 1210.

The district court dismissed without prejudice White's claims against Eslinger and Shaw for a failure to exhaust administrative remedies under the second prong of the test.[5] The court determined that the Seminole County Sheriff's Office had an inmate grievance procedure that White failed to complete. That procedure required inmates to submit an initial Inmate Request form explaining the reason for the grievance. If the inmate's grievance was not resolved, the inmate was then required to submit a Request for Administrative Remedy form, which would be investigated by prison officials. Eslinger and Shaw rely upon the grievance documents found in White's file at the prison, which included three initial Inmate Request forms, two complaining of his isolation and one complaining that he had not received a "regular shower." Inmate Request

---

[4] When ruling on a motion to dismiss for failure to exhaust administrative remedies, the court may consider evidence outside the pleadings. *Bryant*, 530 F.3d at 1376.

[5] On appeal, Eslinger and Shaw argue that the district court also should have dismissed White's complaint under the first prong of our exhaustion test. But nothing in White's complaint and evidentiary submissions, standing alone, establishes that the prison had an available administrative remedy. Indeed, White's Fourth Affidavit states he was told that conditions of confinement are not grievable.

15

Forms, Doc. 123-4. White's file from the prison also contained a single completed Request for Administrative Remedy form—dated approximately ten months after White's Inmate Request forms with regard to his confinement—concerning misplacement of a newspaper he had purchased.

White concedes that he did not submit the necessary grievance form, but he contends that he was denied the forms by prison officials. He submitted affidavits attesting that he attempted to obtain "grievance forms" (presumably, a Request for Administrative Remedy form) on May 25 and again on May 26, 2014, both orally and in writing, but was told by a Lieutenant Heath that his condition of confinement issues were not "grievable," and that he was "denied forms." In another affidavit, White stated that he submitted numerous Inmate Request forms that were not present in the file submitted by Eslinger and Shaw, including the form that led to his conversation with Lieutenant Heath. That form, according to White, contained specific allegations about his conditions of confinement, including the lack of outdoor recreation, lack of routine access to showers and shaving materials, constant exposure to bright lights, constant video surveillance, the sewer drain, the lack of windows, and the lack of hot water. Indeed, the earliest Inmate Request form placed in the record by Eslinger and Shaw suggests that White had previously submitted two Inmate Request forms that are not in the record, noting: "This is my third form. I was told the first two were thrown out for

16

lack of a signature." May 22 Inmate Request Form, Doc. 123-4 at 1. According to White, he was repeatedly denied Request for Administrative Remedy forms during his six months in isolation.

The district court concluded that White failed to exhaust his administrative remedies. The court determined that White's claims that he was denied grievance forms were not credible because White (1) provided neither the "pertinent dates" on which he asked for and was denied the relevant forms, and did not identify the "specific issues" he was told were "not grievable," (2) did not pursue any administrative remedies during a several month period when he was at a different correctional facility, and (3) actually did file the relevant form months after his isolation ended when he complained about a missing newspaper. D. Ct. Order, Doc. 144 at 11-12. In the alternative, the district court held that even if White was denied access to the Request for Administrative Remedy forms prior, he could have filed one once the forms became available to him several months after his isolation ended.

The district court relied on factually incorrect or legally erroneous considerations in determining that White failed to exhaust administrative remedies. First, White submitted evidence of virtually all of the specific details that the district court said were missing. The court determined, in part, that White was not credible because he failed to identify the dates on which he asked for forms and

was denied them and the specific complaints he was told were not grievable. But White submitted a sworn affidavit stating that he asked for and was denied grievance forms on May 25 and 26, 2014, and that on May 26 Lieutenant Heath informed him that conditions of confinement issues were not grievable. Another of his affidavits indicated that the Inmate Request form that prompted White's conversation with Lieutenant Heath contained the same complaints that White included in his letter to the U.S. Marshal. The letter to the Marshal, in turn, includes White's complaints about virtually all of the conditions described in the complaint. The district court's finding that White provided only "bald assertions" because he did not specify dates or details concerning his attempts to obtain the relevant forms is belied by the record, and was therefore clearly erroneous.

Second, the district court's conclusion that White failed to exhaust administrative remedies because he failed to pursue any after he was transferred out of the prison near the end of December 2014 improperly shifted the burden of proof. Eslinger and White bore the burden of establishing that White failed to exhaust his available administrative remedies. *Dimanche*, 783 F.3d at 1210. But they have failed to place in the record—nor does the record contain—any evidence suggesting that any administrative remedies were available to White when he was no longer incarcerated at the prison. The district court misapplied the law in

18

penalizing White for failing to take advantage of remedies the defendants failed to prove were available to him.

Third, the district court's alternative conclusion, that White was obligated to file a Request for Administrative Remedy form months after his isolation ended, when the form became available to him while he was temporarily back at the prison between March and April of 2015, is also inconsistent with our law. The parties agree that White was removed from isolation in November 2014. The record shows that a Request for Administrative Remedy form became available to White in April 2015, when he filed such a form concerning a missing newspaper. The prison's policy, however, required grievances to be filed within ten days of the events giving rise to the grievance. The record contained no evidence that there was a "good cause" exception—or any other exception—to this policy. "[A]n administrative procedure is unavailable when . . . it operates as a simple dead end." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). "When the facts on the ground demonstrate that no [] potential [relief] exists, the inmate has no obligation to exhaust the remedy." *Id.* Here, White had no obligation to file an out-of-time grievance that could not have resulted in relief, according to the prison's policy. The district court therefore erred in concluding that White failed to exhaust administrative remedies because he did not file a grievance when the relevant form became available to him in April 2015.

19

To be sure, the fact that White eventually filed a Request for Administrative Remedy form on an issue unrelated to his isolation conditions is a factor that the district court may determine bears on White's credibility. *See Bryant*, 530 F.3d at 1377. The district court made such a determination here, and doing so was not error. Regardless, the district court's order concluding that White failed to exhaust administrative remedies cannot be sustained based on the credibility determination alone because the court's credibility finding was based on clear errors concerning the contents of the record. That being so, we cannot say that White's substantial rights were unaffected by the district court's errors. *See* Fed. R. Civ. P. 61. We therefore vacate the district court's dismissal without prejudice of White's claims against Eslinger and Shaw.[6]

## IV.   CONCLUSION

For the foregoing reasons, we affirm district court's dismissal with prejudice of White's claims against Berger, Thompson, and Seminole County. We vacate

---

[6] White also appeals the district court's decision to strike for a failure to comply with local rules a report written by Dr. Eric Ostrov assessing White's mental state. We need not decide whether the district court properly struck the report because any error was harmless and could not have affected White's substantial rights. *See* Fed. R. Civ. P. 61. The district court dismissed White's claims against Berger, Thompson, and Seminole County, and we now affirm that decision, on grounds wholly unrelated to the subject matter of Dr. Ostrov's report. The only dispositive issue left open by this court's decision is Eslinger and Shaw's motion to dismiss. For all issues except exhaustion, that motion turns exclusively on the sufficiency of the third amended complaint, and Dr. Ostrov's report has nothing to do with whether White appropriately exhausted administrative remedies. Hence, at this point in the case, any error in excluding Dr. Ostrov's report was harmless. Moreover, White is not prohibited from re-filing Ostrov's report as an exhibit to a future motion or response for which the report has relevance.

20

the district court's dismissal without prejudice of White's claims against Eslinger and Shaw.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**